# In the United States Bankruptcy Court
## for the
### Southern District of Georgia
#### Savannah Division

**FILED**
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
*By dreese at 11:58 am, Aug 22, 2014*

In the matter of:  )
                   )
STERLING BLUFF INVESTORS, LLC,  )  Chapter 11
                   )
*Debtor.*  )  Case No. <u>14-40200-EJC</u>
_____  )

### OPINION

In 2008, a group of investors formed Sterling Bluff Investors, LLC ("<u>SBI</u>" or "<u>Debtor</u>") to purchase the last unsold lots and the right to receive the proceeds from the sale of numerous club memberships in a luxury residential development called The Ford Plantation. These investors hoped that these assets could be sold over time at a profit. In its entire history, SBI never sold a single lot, employed a single person, or erected a single building. The Debtor's proposed plan reveals its intent for the future: the Debtor's business model as a passive real estate investment will not change; old equity will be eliminated; and a subset of the Debtor's current ownership will cover cash shortfalls as the assets are liquidated over an eight-year period. In exchange for this capital infusion, this subset of investors would receive new equity interests and an injunction stopping the Debtor's secured lenders from collecting against them personally on their guaranties of the Debtor's loans. After balancing the equities, the Court concludes that the Debtor filed this bankruptcy case in bad faith; the purpose of Chapter 11 is not to hinder and delay creditors' ability to collect against the guarantors of a failed land speculation investment. Accordingly, this case will

be dismissed for cause as a bad faith filing as well as for cause  within the meaning of 11 U.S.C. § 1112(b)(4)(A) because the Court finds there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."

The following motions are ready for decision: the Motion of The Coastal Bank for Dismissal of Case, or in the Alternative for Grant of Stay Relief ("Motion to Dismiss" or "Motion for Stay Relief") (dckt. 12) and The Ford Plantation Club, Inc.'s ("Club") "Joinder" (dckt. 31) to the Motion to Dismiss but only with respect to The Coastal Bank's ("TCB") "request for entry of an order dismissing the Debtor's bankruptcy case."  The Motion for Allowance and Payment of Administrative Expense and Motion to Require Debtor to Maintain Property (dckt. 105) filed by the Ford Plantation Association, Inc. ("POA") (the homeowners' association), and the Motion of Debtor to Extend Exclusive Periods Within Which to File a Plan and Obtain Acceptances Thereof (dckt. 183) are also pending before the Court.

The Court held hearings on these matters on May 12, 2014, July 14, 2014, and July 15, 2014.[1]  The Court took the matters under advisement at the conclusion of the July 15, 2014 hearing.  Because the Court grants TCB's Motion to Dismiss and Motion for Stay

---

[1] Two other matters on the Court's calendar were withdrawn by agreement, namely the Debtor's Motion in Limine to Exclude Certain Testimony of Expert David E. Lane and F. Andrew DeWitt (dckt. 145) and The Coastal Bank's Motion in Limine, Pursuant to FRE 702, to Exclude Certain Testimony Proffered by Debtor's Expert Ralph Stewart Bowden Relating to the Price or Value of any Club Membership (dckt. 155).

Relief, the remaining matters will be denied as moot.

I.    JURISDICTION

This Court has jurisdiction pursuant to the following sources: sections 151, 157(a), and 1334(b) of Title 28 of the United States Code and the United States District Court for the Southern District of Georgia's Order dated July 13, 1984, which refers all cases under Title 11 of the United States Code to the bankruptcy judges in the District. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(G). Furthermore, venue is proper. *See* 28 U.S.C. §§ 1408–1409. In accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure, I make the following Findings of Fact and Conclusions of Law.

II.    FINDINGS OF FACT

The Court held evidentiary hearings on May 12, 2014, July 14, 2014, and July 15, 2014. At the May 12, 2014 hearing, Nick Cassala, the CEO and General Manager of both the Club and the POA, testified about the background of the Club and the Debtor's participation in the development. The Court also heard testimony from David Mandel, a representative of TCB; Andrew DeWitt, who appraised the Debtor's real estate; Kethesparan Srikanthan, a former manager of SBI and currently the exclusive listing broker of the Debtor's lots; Keith Hellmann, the CFO of the Club and POA as well as the Treasurer of the POA; David Lane, TCB's appraiser of the Debtor's lots and memberships; and Michael Greene, the manager of the Debtor. The following facts were either proven or are the proper subject of judicial notice. *See* Fed. R. Evid. 201.

A.    Introduction

The Ford Plantation is a real estate development along the mouth of the Ogeechee River, which is located just south of Savannah, Georgia. Originally the site of Henry Ford's private retreat, this 1,800-acre tract has been developed over the years into an exclusive residential development consisting of 400 residential lots. (Hr'g Tr. May 12, 2014, dckt. 206, at 125:1–3.) The Ford Plantation has many features designed to appeal to wealthy individuals who can afford second homes. There is a Pete Dye-designed championship golf course, tennis courts, a fitness center, a deep water marina, equestrian facilities, a clubhouse for dining, six lakes, six miles of fenced acreage, and thirteen miles of paved roads that are illuminated by gas lights. The original Ford mansion, which is used for lodging and as a gathering space, serves as a center piece to this pristine coastal property. (Dckt. 206, at 120:4–12.)

B.    Structure of the Club at The Ford Plantation

After the Ford family relinquished control of the property, it became a real estate development with a succession of entities involved in its growth. More specifically, The Ford Plantation was developed in the late 1990s by The Ford Plantation, LLC ("Original Developer"). (Dckt. 206, at 121:10–11.) The Ford Plantation's original plans call for 400 residential lots that are owned by the Club's resident members. (Stip. 2.)[2] These resident

---

[2] On May 30, 2014, the Debtor and TCB agreed to certain stipulations of fact for purposes of the Court's SARE determination, which the Court now incorporates by reference into this Order. (Dckt. 184.) The stipulations were also largely proven by the evidence presented at the hearings. For this Order, citations to these stipulations will

members have access to all of the above-described amenities and facilities. Indeed, as a condition to owning a residential lot, purchasers must apply to become a member of the Club. To formalize this requirement, on October 20, 1998, the Original Developer recorded the Club Declaration for The Ford Plantation Club, Inc. ("Club Declaration") in Deed Book 45, Page 282, of the real property records of Bryan County, Georgia. (Club Ex. 6.) The Club Declaration governs the rights, privileges, terms, and conditions associated with resident memberships in the Club ("Resident Memberships") and provides that:

> In order to ensure that membership in the Club remains predominantly with the homeowners in the Plantation, the Declarant is requiring that all purchasers of residences and/or residential lots in the Plantation apply for membership in the Club, and if approved, become members of the Club. Declarant hereby declares that all of the real property [in The Ford Plantation] shall be held, sold, transferred, conveyed, used, occupied, mortgaged or otherwise encumbered subject to this Club Declaration. This Club Declaration shall run with title to and shall be binding on all Persons having any right, title, or interest in all or any portion of such real property, their respective heirs, legal representatives, successors, successors-in-title, and assigns, and shall inure to the benefit of each and every owner of all or any portion thereof. . . .

(Club Ex. 6, at 1.) Additionally, Article 2.7 of the Club Declaration provides that when a lot is resold, the Resident Membership associated with the lot does not pass with title. Instead, "the [Resident Membership] interest shall be deemed reassigned to the Club." (Club Ex. 6, at 3; Stip. 4.)

In addition to Resident Memberships, the Club offers for sale another type of membership to individuals who do not own property in the development ("Sporting

---

appear as "(Stip.)".

Memberships"). Although the Club Declaration does not address Sporting Memberships, the development's original plans contemplated up to ninety-five "Equity Sporting Members," who would be entitled to use the Club's facilities. (Stip. 6.)   Presently, a Resident Membership holder has an equity interest in the Club's assets whereas a Sporting Membership holder does not.  There is one equity Sporting Membership still in effect, but this type of membership is no longer issued. (Dckt. 206, at 121:18–21.)

Currently, yearly Club dues are $21,000.00, and POA assessments are $3,100.00.  (Dckt. 206, at 131:1–25.)   Annual membership dues were originally set at $25,000.00 per year. The initial cost of a Resident Membership was $125,000.00. The Club recently lowered the initiation fee for a Resident Membership from $125,000.00 to $50,000.00 and created a temporary Club credit of $3,800.00 for the yearly dues. (Dckt. 206, at 184:6–9.)  Those changes took effect on March 29, 2014.[3]  (Dckt. 206, at 187:4–10.)

The various club facilities are owned by the Club, and certain common areas are titled in the POA.  The Club is governed by a nine-member board of directors, and the POA is governed by a three-member board of directors.  (Dckt. 206, at 128:4–18.)  To become a member of the Club, a lot purchaser must first submit an application to the Club.

---

[3] These changes were made to stimulate lot sales and attract new members to The Ford Plantation.  The Club also recommended that the membership vote to eliminate the 50-mile radius restriction for Sporting Members.  (If approved, this would allow, for the first time, individuals who live within 50 miles of The Ford Plantation to become Sporting Members.)  (Stip. 29.)

Then, the Club conducts a background check, a financial check, and a membership committee interview. Next, the membership committee makes a recommendation to the Club board regarding whether the prospective member should be approved. The Club board makes the final decision about whether to approve a prospective member. (Dckt. 206, at 129:5–15.)

C.    SBI's Acquisition of Assets

Under circumstances that are not fully developed in the record, the Original Developer was unable to fulfill all of its financial commitments and reorganization of The Ford Plantation was undertaken by the various stakeholders. It was at this juncture that the investors of SBI became involved in the development.

In July 2008, the Original Developer sold its remaining sixty-three lots in The Ford Plantation to SBI. (Dckt. 206, at 122:6–8.) As part of this transaction, SBI, the Original Developer, the Club, and the POA entered into the Turnover Agreement (dated June 4, 2008 and effective July 18, 2008) through which the Original Developer *turned over* its assets to the other parties and exited the operation. (Club Ex. 1; dckt. 206, at 123:23 to 124:6.) At the time of the Turnover Agreement, there were about 300 Resident Members and two Sporting Members. (Dckt. 206, at 123:2–6.)

Pursuant to the Turnover Agreement, SBI acquired, as a single investment, a

group of assets for approximately $12 million.[4]  These assets consisted of sixty-three residential lots, ninety-six Resident Memberships, and ninety-two Sporting Memberships. The initial investors of SBI believed they had acquired the assets at a discount, hoping that the assets might have a value of more than $20 million.  The investors' plan was to sell the lots over time and to collect the proceeds from the sale of Resident Memberships and Sporting Memberships, thereby recouping their investment and earning a substantial profit.

The investment was financed largely by the participation of members of SBI and bank loans from TCB. On July 18, 2008 SBI executed a promissory note in the principal amount of $6,250,000.00 in favor of TCB ("2008 Note").   (TCB Ex. 1; Stip. 8.) Contemporaneously with the execution of the 2008 Note, SBI executed and delivered to TCB the Real Estate Deed to Secure Debt, which described the original sixty-three lots and the fifty Resident Memberships pledged as collateral to TCB. (TCB Ex. 2; Stip. 10.) Also, SBI executed and delivered to TCB the Security Agreement and Assignment of Ford Plantation Club Resident Memberships. (TCB Ex. 3; Stip. 11.)

On September 30, 2010, the Debtor pledged three additional lots that it had subsequently acquired to TCB in connection with the Note Modification Agreement and Modification of the Deed to Secure Debt. (TCB Exs. 4–5; Stip. 12.) With the addition of

---

[4]  SBI is a Georgia Limited Liability Company formed for the purpose of acquiring for resale lots in The Ford Plantation along with corresponding Resident Memberships and to sell Sporting Memberships. (Stip. 5.)

these three lots to the original sixty-three lots, the total number of lots held by TCB as collateral increased to sixty-six lots, together with the right to receive proceeds with respect to the corresponding fifty memberships pledged as collateral to TCB. (Stip. 13.)

TCB's 2008 Note matured by its terms on June 18, 2011. On that date, SBI executed a renewal Commercial Promissory Note ("2011 Note") in the principal amount of $5,625,000.00. (TCB Ex. 8; Stip. 18.)

In 2012, SBI purchased an additional six lots in The Ford Plantation to bring its total real estate holdings to seventy-two lots. (Stip. 15.) SBI purchased three of the lots from banks who had foreclosed on the properties. SBI acquired the other three lots by initiating foreclosure proceedings itself. (Dckt. 206, at 136:14–25.)

The Debtor has several other secured creditors. South Carolina Bank and Trust, as successor by merger with Bryan Bank & Trust, asserts a $393,757.81 claim secured by thirteen Resident Memberships. (Claim 3-1.) The Club asserts a $2,240,000.00 claim secured by ninety-one Sporting Memberships, 24 Resident Memberships, and six lots. (Claim 8-1.) The Club also asserts a $1,827,126.14 claim secured by all seventy-two of the Debtor's lots for unpaid dues, maintenance charges, late fees, and interest.[5]  (Claim 9-1.)

---

[5] Under the Turnover Agreement, SBI was exempt from paying membership dues. (Dckt. 206, at 133:12–17.) However, the Club now asserts that the Debtor is no longer exempt because the Club terminated the Debtor's rights under that agreement after it defaulted on its payment obligations.

AO 72A
(Rev. 8/82)

The POA asserts a $163,944.34 claim secured by all seventy-two of the Debtor's lots for prepetition homeowners' association dues. (Claim 6-1.)

D.    SBI's Financial Troubles

The SBI acquisition in July 2008 occurred on the eve of what has proven to be a prolonged recession that severely impacted the marketability of these luxury residential lots and club memberships. According to Mr. Cassala, lots have sold for as little as $1 and for nearly $1 million during his tenure. (Dckt. 206, at 138:16–21.) Since 2008, SBI has not sold a single lot.

In short, SBI's business plan never came to fruition. As the lots remained unsold, expenses and debt service continued apace. Notwithstanding the lack of revenue, until 2013, SBI continued to service the debt on the property, to pay POA assessments, and to pay property taxes, all through additional capital contributions from its members. The ownership of SBI changed over the years as some members became unwilling to invest further in the project.[6]

The continued failure to sell any lots created mounting financial pressure for SBI. Around March 2012, select members of the Club and SBI formed a committee that met

---

[6] SBI Loan, LLC, an entity through which a subset of investors continued to invest in the Debtor, filed a proof of claim in the case asserting a $5,917,809.17 claim. (Claim 5-1.)

several times to consider restructuring of the financial arrangements. By August 2012, the Debtor had negotiated certain changes to the Turnover Agreement ("Turnover Amendment") in an effort to promote sales and restructure its prospects for the future. (Club Ex. 3; dckt. 206 at 148–49.) SBI, the Club, and the POA entered into the Turnover Amendment, which had an effective date of October 19, 2012. (Club Ex. 3.)

The Turnover Amendment modified the payment schedule to the Club. Under the Turnover Agreement, SBI was obligated to pay $4.45 million to the Club but only made $2.45 million in payments before the Turnover Amendment was entered into. At the time of the Turnover Amendment, two $1 million payments remained due in July 2012 and July 2013, respectively. Under the Turnover Amendment, $250,000 was due on the effective date; $250,000 was due on July 18, 2013; $250,000 was due on July 18, 2014; $750,000 was due on July 18, 2015; and $500,000 was due on December 31, 2015. (Club Ex. 3, at 5.)

Mr. Srikanthan, the original manager of SBI, is the sole proprietor and manager of Ford Plantation Properties, LLC, an independent real estate brokerage firm that is located just outside the Ford Plantation. (Dckt. 206, at 134:7–19.) SBI markets its lots through Mr. Srikanthan's brokerage firm. In contrast, the Club engaged Seabolt Brokers in July 2013 to sell lots owned by the Club. Since then, Seabolt Brokers has sold one vacant lot for $985,000.00. (Dckt. 206, at 195:17 to 196:11.) Of the 400 lots, only about 155 have completed homes. (Dckt. 206, at 120:18–24.)

E.     SBI's Defaults

By December 2012, SBI was also seeking to restructure its loan with TCB. No agreement was reached. In March 2013, SBI defaulted on its quarterly payment to TCB and has not made a payment to the bank since. Mr. Cassala testified that Mr. Greene told him that SBI was not going to make the required payment to TCB in the first quarter of 2013 as a part of a strategy to make TCB renegotiate with SBI. (Dckt. 206, at 164:18–23.)

Under the Turnover Amendment, SBI made the first new payment of $250,000.00 to the Club but did not make the next payment that was due on July 18, 2013. After SBI defaulted under the terms of the Turnover Amendment, the Club claims to have terminated the amendment and reinstated the Turnover Agreement.[7] (Club. Ex. 5.) SBI never made the last two yearly payments of $1 million each, which were due in 2012 and 2013, under the terms of the Turnover Agreement. (Dckt. 206, at 137–39.) On July 22, 2013, the Club sent a notice of default and reservation of rights to SBI. (Club Ex. 4; dckt. 206, at 165:24–25.) On October 28, 2013, the Club and the POA sent another notice of default and reservation of rights to SBI. This notice contained the following paragraph:

> Notwithstanding the Club's and the Association's demand for payment, SBI has failed to pay the amounts due. Accordingly, the Club and the Association hereby terminate all rights and privileges of SBI and Ford Plantation Properties LLC arising under and related to the Turnover Agreement and the other Turnover Documents.

(Club Ex. 4, at 2.)

---

[7] The Court declines to comment on whether the Club had the legal right to do so.

After its default in March 2013, SBI continued to make proposals to TCB regarding a restructuring of its debt. In December 2013, TCB notified SBI, who has a right of first refusal in the event that TCB sells its note, that it was engaged in negotiations with a third party. Mr. Mandel testified that this third party was only willing to buy the note if it could receive title to the collateral immediately. (Dckt. 206, at 219:7–17.) Therefore, SBI's cooperation was essential to the consummation of a deal. TCB proposed that it would release the guarantors from any further liability under the note if SBI would execute a deed in lieu of foreclosure for the collateral and make a cash payment. Although TCB believed it had made a fair offer to SBI, SBI responded by demanding to know the content of TCB's conversations leading up to the deal. (Dckt. 206, at 221:8–18.) After SBI made a counteroffer that was unacceptable to the third party, the hoped-for deal fell apart and was never revived. (Dckt. 206, at 221:19–25.)

In January 2014, TCB began running a notice of sale in the Bryan County News advertising the foreclosure sale of the sixty-six lots and the fifty Resident Memberships that served as its collateral. The foreclosure sale was to be held on the first Tuesday of February 2014, which was February 4, 2014. Some last minute overtures were made by SBI to TCB to reach an accord, but those efforts likewise failed. On February 3, 2014, the Debtor filed a Chapter 11 petition. Consequently, the automatic stay went into effect stopping the foreclosure sale.

F.     The Motion to Dismiss and Motion for Stay Relief

On February 7, 2014, TCB filed the Motion to Dismiss and Motion for Stay Relief, seeking relief from the automatic stay in the alternative. (Dckt. 12). The Club joined TCB's Motion to Dismiss. (Dckt. 31.) Motions for Rule 2004 exams were filed and opposed. After each party retained valuation experts and exchanged reports, the parties filed motions in limine to exclude the testimony of the respective experts. (Dckt. 145.)

The matters came on for hearing on May 12, 2014. At that hearing, counsel for the POA announced the POA's support of the Motion to Dismiss. As a preliminary matter, TCB was asserting in the Motion for Stay Relief that this case involved single asset real estate ("SARE") within the meaning of 11 U.S.C. § 101(51B). Because questions of fact existed regarding the "single asset real estate" determination, the alleged lack of equity in TCB's collateral, and other matters relevant to the Motion to Dismiss and Motion for Stay Relief, the Court issued a scheduling order (dckt. 162) to allow the parties to pursue discovery.

At the May 12, 2014 hearing, Kirk M. McAlpin Jr., special litigation counsel for the Debtor, argued that the Debtor may have three potential causes of action against the Club. First, he argues, the Club breached the Turnover Agreement and Turnover Amendment. (Dckt. 206, at 15:10–15.) Second, the Club fraudulently induced SBI to entering into the Turnover Agreement. (Dckt. 206, at 30:20–23.) Third, the Club tortiously

interfered with SBI's contract with TCB, especially SBI's right of first refusal.[8] (Dckt. 206, at 42:3–18.)

The continued hearing was scheduled for July 14, 2014 and July 15, 2014. On Friday, July 11, 2014, the Debtor filed its disclosure statement (dckt. 212) and plan of reorganization ("Plan") (dckt. 213).

The parties were able to agree on the value of TCB's collateral,[9] which rendered moot the motions in limine as to the respective experts. Mr. Lane was allowed to testify about his appraisal, and the Court received into evidence his reports dated July 2013 and May 2014.

## III.   SARE DETERMINATION

As a preliminary matter, the Court will address an issue raised by TCB that may or may not have been rendered moot by the Debtor's filing of a plan and disclosure statement on July 11, 2014. *See* 11 U.S.C. § 362(d)(3)(A) (requiring that the filed plan have

---

[8] The Debtor's disclosure statement for its reorganization plan provides that its claims against the Club include "(i) a breach of the Turnover Agreement with respect to the Club's duties as to the marketing of the Debtor's lots and memberships and the creation of a sales incentive program; (ii) the turnover of certain funds by the Club received from the sale of at least two memberships, which sale proceeds rightfully belong to the Debtor; and (iii) a claim for fraudulent inducement with respect to a 2012 Amendment to the Turnover Agreement." (Dckt. 212, at 8.)

[9] The Debtor and TCB stipulated that the value of TCB's collateral, namely sixty-six lots and fifty Resident Memberships, is $3.8 million.

"a reasonable possibility of being confirmed within a reasonable time"). In its Motion for Stay Relief, TCB alleges that "the single asset real estate case requirements for continuance of the stay" apply in this case. (Dckt. 12, at 3.) In its response to the Motion for Stay Relief, the Debtor disputes that the elements of SARE as defined in 11 U.S.C. § 101(51B) are met in this case.[10] (Dckt. 143, ¶ 32). At the May 12, 2014 hearing, the Court indicated its intention to rule on the SARE issue at the July 14 and 15 hearings and invited the parties to pursue any necessary discovery and to file stipulations of fact on that issue. For the reasons explained below, the Court finds that the Debtor's seventy-two lots are SARE and, therefore, the additional case requirements of § 362(d)(3) apply.

As explained above, the Debtor's assets consist of seventy-two residential lots in The Ford Plantation, along with the right to receive proceeds from the issuance of ninety-six Resident Memberships and ninety-one Sporting Memberships. (Stip. 7.) The Debtor does not own or lease any real property other than the seventy-two lots. (Stip. 24.) All of the seventy-two lots are pledged as collateral to secured creditors. Sixty-six of the lots are pledged to TCB. The other six lots are pledged to the Club. (Stip. 28.)

The Debtor's business consists of marketing the seventy-two lots, with their corresponding Resident Membership, and marketing the Sporting Memberships. (Stip. 27.)

---

[10] In its Chapter 11 petition, the Debtor did not indicate that the nature of its business was "Single Asset Real Estate as defined in 11 U.S.C. § 101(51B)." (Dckt. 1, at 1.)

Nevertheless, since its formation, the Debtor has been unable to sell any of the seventy-two lots. (Stip. 30.) The Debtor's gross income from the operation of its business from January 1, 2012 to date is as follows:

| 2012 | $103,966.00 |
| 2013 | $3,000.00 |
| 2014 | $0.00 |

(Stip. 30.) The 2013 income came from interest, and the 2012 income was generated by the sale of a Resident Membership. Mr. Srikanthan testified that the Debtor has received proceeds from the sale of eight to ten Resident Memberships since 2008. These Resident Memberships were not sold in connection with a lot owned by the Debtor. The Debtor anticipates that its primary source of cash flow during the first year of bankruptcy will be from loans made by SBI Loan, LLC (an entity owned by a subset of the members of the Debtor) unless a lot or a membership is sold. (Stip. 32.)

Section 362(d)(3) provides:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

. . . .

(3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later—

(A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable

time; or

(B) the debtor has commenced monthly payments that—

(i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

(ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate[.]

11 U.S.C. § 362(d)(3). The Bankruptcy Code defines "single asset real estate" as follows:

The term "single asset real estate" means real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto.

11 U.S.C. § 101(51B). When these two statutes are read together, they make clear that stay relief under § 362(d)(3) only applies to real property. Therefore, the focus of stay relief under this provision is the seventy-two lots owned by the Debtor and not the Resident Memberships and Sporting Memberships, which are personal property. Nevertheless, as a practical matter, granting stay relief with respect to the real estate would lead to grounds for stay relief as to the Debtor's other assets. As of the date of this Order, only TCB, who holds a security interest in sixty-six of the lots, has requested stay relief.

For the additional case requirements of § 362(d)(3) to apply, the Court must first find the following:

AO 72A
(Rev. 8/82)

(1) the seventy-two lots are real property constituting a single property or project;

(2) the seventy-two lots are not residential real property with fewer than four residential units;

(3) the seventy-two lots generate substantially all of the gross income of the Debtor;

(4) the Debtor is not a family farmer; and

(5) on the seventy-two lots,[11] no substantial business is being conducted other than the business of operating the real property and activities incidental thereto. *See* 11 U.S.C. § 101(51B).

Three of these elements (the first, second, and fourth) are easily met. There is no serious dispute that the seventy-two lots comprise a single project. *See Whitfield Co. v. Tad's Real Estate Co., Inc. (In re Tad's Real Estate Co., Inc.)*, No. 97-11999, 1998 WL 34066143, at * 2 (Bankr. S.D. Ga. Mar. 23, 1998) (Dalis, J.) (finding that the debtor's fifty-nine vacant lots and five rented lots with houses built on them constituted "a single project with a common intended use, plan or scheme" because the debtor's intent was to develop a

---

[11] In a case cited by the Debtor, *In re Philmont Development, Co.*, 181 B.R. 220, 223 (Bankr. E.D. Penn. 1995), the court stated this element differently: "the debtor must not be involved in any substantial business other than the operation of its real property and the activities incidental thereto." *Id.* at 223. This formulation, however, writes the phrase "on which" out of the definition of SARE. The phrase "on which" clearly refers to "real property"; therefore, the proper inquiry is whether any substantial business other than operating the real property and activities incidental thereto is conducted *on the real property*, which is the seventy-two lots in this case. *See Suntrust Bank v. Global One, L.L.C. (In re Global One, L.L.C.)*, 411 B.R. 524, 528 (Bankr. S.D. Ga. 2009) (Davis, J.) ("There is no doubt that the property meets the definition [of SARE]. It constitutes a single project . . . and no business is being conducted *on the property*." (Emphasis added)).

SAO 72A
(Rev. 8/82)

residential subdivision); *In re Philmont Dev. Co.*, 181 B.R. 220, 223–24 (Bankr. E.D. Penn. 1995) (finding that a series of semidetached houses with separate mailing addresses within the same development constituted a single project). Indeed, all of the lots are vacant, located in the same residential development, and were generally acquired as part of a single transaction. (Stips. 1, 7.) Next, although all of lots are residential real estate (Stip. 25), there are seventy-two such lots and, therefore, the real property does not consist of fewer than four residential units. Lastly, the Debtor is clearly not a family farmer because it is not engaged in a farming operation. *See* 11 U.S.C. § 101(18).

As to the third element, the Court must determine whether the seventy-two lots generate substantially all of the gross income of the Debtor. TCB argues that such is the case because the Debtor has no substantial business (other than incidental activities) aside from the business of attempting to sell the seventy-two lots and "past sales have indicated an utter lack of market appetite for Sporting Memberships." (Dckt. 186, ¶ 8.) In response, the Debtor argues that this element is not met because its gross income from the past few years has been "from the sale of memberships, and not due to the passive operation of real property." (Dckt. 185, ¶ 9.)

Under the facts and circumstances of this case, I conclude that it is appropriate to look at the Debtor's business model (as originally conceived and as proposed in the Plan) rather than to just look at the past few years to determine whether the seventy-two lots

generate substantially all of the gross income of the Debtor. Over this longer time period, I find that the lots would generate (in the event that any were sold) substantially all of the Debtor's gross income. Admittedly, this is a close call. On one hand, as the Debtor sells all seventy-two lots (potentially within the next seven to ten years) the sale of each lot may generate additional income because the purchaser of the lot will be required to purchase a Resident Membership, which will in turn be a "sale" of that membership by the Debtor. Therefore, the sale of the lots would generate not only the lot price but also income from the sale of a Resident Membership. As TCB's expert suggested, the Resident Memberships may not have a value separate from the lots from the perspective of a lot purchaser. Both the benefit of access to Club membership and the burden of having to pay the initiation fee are inseparably tied to the purchase of a lot. On the other hand, the Debtor owns more Resident Memberships than lots. However, I find that as a relative matter, the sale of these unconnected Resident Memberships in the future will generate an unsubstantial percentage of the Debtor's income.[12] Furthermore, I find that the sale of the Debtor's Sporting Memberships will generate an unsubstantial percentage of the Debtor's income based on their price and marketability. Even where no actual revenue has yet been generated, other courts have found that the SARE definition was satisfied. *See In re Mountain Edge LLC*, No. 12-10835, 2012 WL 4839784, at *3 (Bankr. D.N.M. Oct. 10, 2012) (citing *In re Kkemko, Inc.*, 181 B.R. 47, 51 (Bankr. S.D. Ohio 1995)) ("It is generally accepted that raw land or real property acquired and/or held for development falls within the definition of SARE.").

---

[12] For example, the Club recently sold a lot for $975,000 compared to the initial cost of a Resident Membership of $50,000.

As to the fifth element, the Court has no difficulty concluding that no substantial business is being conducted on the seventy-two lots other than the business of operating the real property and activities incidental thereto. Essentially, the Debtor holds passive investments in real estate and personal property. Although the Debtor's business "consists of marketing the 72 Lots, with their corresponding Resident Membership, and marketing the Sporting Memberships" (Stip. 27), this work is largely conducted off-site by third-parties due to the fact that the Debtor has no employees. Furthermore, these activities are not "substantial" within the meaning of § 101(51B). *Cf. In re Prairie Hills Golf & Ski Club, Inc.*, 255 B.R. 228, 230 (Bankr. D. Neb. 2000) (finding that the SARE definition did not apply to a debtor that "develops and sells residential lots; constructs and maintains roads to the golf, ski, and residential areas; mows and removes snow from the golf course and residential areas; continues to develop the golf and ski areas; sells liquor in the clubhouse; operates the farmland; and leases the golf and ski facilities to [another entity]"). Furthermore, these sales and marketing efforts are simply part of the Debtor's business of operating the real property, if it can even be said that such minimal activities constitute "operating," and do not qualify as a separate business.

In its brief, the Debtor argues that it cannot be subject to the additional case requirements of § 362(d)(3) because the Resident Memberships and Sporting Memberships are significant assets. (*See* dckt. 185, ¶ 7.) This argument has already been considered and

rejected by one of my colleagues in the Southern District of Georgia. In *Suntrust Bank v. Global One, L.L.C. (In re Global One, L.L.C.)*, Judge Davis stated the following:

> Debtor argues that [§ 362](d)(3) does not apply because it has a counterclaim against Portrait Homes in Superior Court, which "is clearly not real property nor is it an attachment or appurtenance to the property." This fact does not change this Court's finding. The focus of the definition is not whether the case involves a "single asset" but rather whether the stay applies to "single asset real estate" held by a bankruptcy estate.

411 B.R. at 528 (citation omitted). I agree with that reasoning and find that the Debtor's ownership of the right to receive proceeds from the sale of the memberships does not preclude me from finding that § 362(d)(3) applies to the seventy-two lots.

As of the date of this Order, the Court determines that the Debtor is subject to 11 U.S.C. § 362(d)(3) because the seventy-two lots owned by the Debtor are SARE within the meaning of 11 U.S.C. § 101(51B). This finding impacts the Court's consideration of the Motion for Stay Relief and the Motion to Dismiss; however, this finding is not essential to the Court's determination that it is appropriate to grant those motions.

IV.    MOTION TO DISMISS

Upon motion of a party in interest after notice and hearing, a court must, for cause, convert or dismiss a Chapter 11 case, whichever is in the best interest of creditors and the estate, unless the court determines that the appointment of a trustee is in the best interest of creditors and the estate. 11 U.S.C. § 1112(b)(1). TCB and the Club, as the movants, must show that cause exists by a preponderance of the evidence. *See Bal Harbour Club, Inc. v.*

*AVA Dev., Inc. (In re Bal Harbour Club, Inc.)*, 316 F.3d 1192, 1195 (11th Cir. 2003); *Canpartners Realty Holding Co. IV, L.L.C. v. Vallambrosa Holdings, LLC (In re Vallambrosa Holdings, L.L.C.)*, 419 B.R. 81, 88 (Bankr. S.D. Ga. 2009) (Davis J.). If cause is shown, the court must dismiss or convert the case unless the court finds that "unusual circumstances" within the meaning of § 1112(b)(2) are present.

A.   Bad Faith as Cause

The enumerated bases of cause in § 1112 are not exhaustive; lack of good faith in filing a Chapter 11 petition may also constitute cause for dismissal. *In re Pegasus Wireless Corp. v. Tsao (In re Pegasus Wireless Corp.)*, 391 F. App'x 802, 803 (11th Cir. 2010); *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 674 (11th Cir. 1984) ("In finding a lack of good faith, courts have emphasized an intent to abuse the judicial process and the purposes of the reorganization provisions. Particularly when there is no realistic possibility of an effective reorganization and it is evident that the Debtor seeks merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights, dismissal of the petition for lack of good faith is appropriate."); *First Bank of Ga. v. Lamb (In re Lamb)*, No. 11-11522, 2012 WL 1944527 (S.D. Ga. May 29, 2012). "Furthermore, possible equity in the property or a potential for a successful reorganization does not preclude a finding of a bad faith filing." *Canpartners Realty*, 419 B.R. at 86 (citing *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.)*, 849 F.2d 1393, 1395 (11th Cir. 1988)). The United States Court of Appeals for the Eleventh Circuit

established a bad faith standard in *Albany Partners* and *Phoenix Piccadilly*. Although the test for a bad faith filing requires a totality of the circumstances analysis, the following factors tend to show that a single asset case has been filed in bad faith:

> (1) the debtor has only one asset, the property at issue; (2) the debtor has few unsecured creditors whose claims are relatively small compared to the claims of the secured creditors; (3) the debtor has few employees; (4) the property is subject to a foreclosure action as a result of arrearages on the debt; (5) the debtor's financial problems essentially are a dispute between the debtor and the secured creditors which can be resolved in the pending state court action; and (6) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

*State St. Houses, Inc. v. N.Y. State Urban Dev. Corp. (In re State St. Houses, Inc.)*, 356 F.3d 1345, 1346–47 (11th Cir. 2004) (citing *Phoenix Piccadilly*, 849 F.2d at 1394–95). The Court will now analyze each of these factors in turn.

1.   *Phoenix Piccadilly Factors*

   i.   *The Debtor Has Only One Asset, the Property at Issue*

Although the Debtor technically owns several assets, in essence, the Debtor owns a single investment, which is similar to the situation where the Debtor owns a single asset such as an office building. The Debtor's assets comprise a single investment because all of the lots are within the same development and revenue from the sale of Resident Memberships, in large part, can only be realized through the sale of the Debtor's lots.[13]

---

[13] The Debtor's Schedule B also lists five notes as accounts receivable and discloses three legal claims. No lawsuit has been filed. Those potential causes of action are a breach of contract claim against the Club with an unknown value, a turnover claim against the Club for proceeds from the sale of a Resident Membership to Richard Levy with an alleged value of $25,000.00, and another turnover claim against the Club for

Likewise, the market for Sporting Memberships will largely depend on the success of The Ford Plantation as a whole and, therefore, is inextricably linked to the Debtor's lots and Resident Memberships. This factor weighs in favor of finding the petition was filed in bad faith.

> ii. *The Debtor Has Few Unsecured Creditors Whose Claims Are Relatively Small Compared to the Claims of Secured Creditors*

According to the Debtor's schedules, it has creditors holding secured claims totaling $7,413,318.29, creditors holding unsecured priority claims totaling $57,492.50, and creditors holding unsecured nonpriority claims of $8,262,875.24. (Dckt. 32, at 1.) Yet, non-affiliated entities hold a relatively small portion of the unsecured claims. With a claim of $5,918,117.24, SBI Loan, LLC, which is a vehicle through which a subset of the Debtor's investors continued to fund the Debtor, is the Debtor's largest unsecured creditor. "Courts applying this second *Phoenix Piccadilly* factor typically disregard unsecured debts owed to insiders, and instead consider only the amounts owed to non-insider, unsecured creditors." *In re State St. Houses, Inc.*, 305 B.R. 726, 735 (Bankr. S.D. Fla. 2002), *aff'd*, 305 B.R. 738 (S.D. Fla. 2003), *aff'd*, 356 F.3d 1345 (11th Cir. 2004). Because the Debtor has "few unsecured creditors whose claims are small in relation to the claims of the secured creditors," this factor weighs in favor of finding the petition was filed in bad faith. *Id.* at 736.

---

proceeds from the sale of Sporting Memberships to Chad and Kim Gracy with an unknown value. (Dckt. 32, at 12.) These listed assets all relate to the Debtor's acquisition of the lots and memberships.

iii.     *The Debtor Has Few Employees*

The Debtor has never had any employees and has no plans to employ anyone in the future. Consequently, this factor weighs in favor of a finding of bad faith. *See Canpartners Realty*, 419 B.R. at 86.

iv.     *The Property is Subject to a Foreclosure Action as a Result of Arrearages on the Debt*

The Debtor filed its Chapter 11 Petition the day before the nonjudicial foreclosure sale was to take place. The Debtor was then in default under its obligation to its secured lenders including TCB and the Club. The Debtor had made no payments to TCB for nearly a year. TCB's note would have matured by its terms on May 18, 2014; however, the Debtor defaulted on its payments about a year before then. Therefore, this factor weighs in favor of a finding of bad faith. *See Canpartners Realty*, 419 B.R. at 86.

v.     *The Debtor's Financial Problems Essentially Are a Dispute Between the Debtor and its Secured Creditors Which Can Be Resolved in the Pending State Court Action*

When the Debtor filed its bankruptcy petition, it was in default on its secured debts. Although the Debtor asserts that it may have causes of action against the Club, the Debtor has not filed suit. The evidence shows that the only major dispute between the Debtor and its creditors is that the Debtor wishes to avoid foreclosure without making the payments it promised to them. *See Humble Place Joint Venture v. Fory (In re Humble Place Joint Venture)*, 936 F.2d 814, 818 (5th Cir. 1991); *Canpartners Realty*, 419 B.R. at 86. On

♦AO 72A
(Rev. 8/82)

27

the other hand, this case does not present the typical two-party dispute found in other cases (where the court dismisses a bad faith filing) because the Debtor has several different secured creditors that hold first-lien positions on its assets. On balance, I find that this factor is neutral regarding a finding of bad faith.

> vi.     *The Timing of the Debtor's Filing Evidences an Intent to Delay or Frustrate the Legitimate Efforts of the Debtor's Secured Creditors to Enforce Their Rights*

The Debtor filed its Chapter 11 Petition the day before the nonjudicial foreclosure sale was scheduled to take place. Normally, the Court would give little weight to this fact for purposes of assessing good faith because filing a bankruptcy petition before a foreclosure sale occurs is essential to preserving a debtor's rights in the collateral. However, in this case, I find that this timing is circumstantial evidence of bad faith because the defaults leading to the foreclosure were longstanding and the secured creditors gave the Debtor a significant amount of time to cure these defaults. The evidence showed that, to a large extent, the Debtor's defaults were strategic, meaning that they were used to try to force a renegotiation of terms with its creditors. As Mr. Greene testified, he did not even attempt to make a capital call among the Debtor's investors before the March 2013 default. In sum, this factor weighs in favor of the Court finding that this case is a bad faith filing.

Additionally, the protection of guarantors is an improper purpose for filing a Chapter 11 petition. *See Humble Place*, 936 F.2d at 818 ("Personal guaranties of non-

debtors are not ordinarily, and are certainly not here, a legitimate concern of Chapter 11."
(footnote omitted)); *In re N. Vermont Assocs., L.P.*, 165 B.R. 340, 342 (Bankr. D.D.C. 1994).
Section 8.3 of the Debtor's proposed plan provides for an injunction prohibiting collection
activities against any guarantor that provides new equity.  In exchange for this protection,
these non-debtors must merely agree to "fund any cash shortfalls occurring under the
Reorganized Debtor's business plan."  (Dckt. 213, § 8.4.)  This plan provision reflects an
intent to delay or frustrate the legitimate efforts of the Debtor's secured creditors to enforce
their rights.  In addition to being filed for an improper purpose, the presence of the *Piccadilly
Phoenix* factors demonstrates that the petition was filed in bad faith.


   2.   *Analysis of Exculpatory Factors*

         Because finding bad faith in filing a Chapter 11 petition is "a finding of fact
not subject to any per se approach," the fact that a single asset debtor fits neatly within the
*Piccadilly Phoenix* factors is not the end of the Court's analysis.  *In re Clinton Fields, Inc.*,
168 B.R. 265, 269 (Bankr. M.D. Ga. 1994) (citing *Home Fed. Sav. v. Club Candlewood
Assoc., L.P. (In re Club Candlewood Assoc., L.P.)*, 106 B.R. 752, 756 (Bankr. N.D. Ga.
1989)).  Next, the Court examines whether there are any exculpatory factors that lead the
Court to conclude that the Debtor filed its petition in good faith.  *See Canpartners Realty*,
419 B.R. at 87.  In *In re Clinton Fields*, the court found that the following factors tended to
show that the filing did not lack good faith:

         1. The secured creditor seeking relief is the seller of the property to the debtor;

◥AO 72A
(Rev. 8/82)

2. The secured creditor has been the recipient of significant cash proceeds from the debtor's efforts to sell a portion of the property;

3. The principals of the debtor have made a substantial capital investment into the property;

4. The debtor has formulated a specific plan for the development of the property prior to filing the Chapter 11 case;

5. The plan for development has been substantially implemented prior to filing the Chapter 11 case;

6. The cause of debtor's financial distress was unforeseen at the time of the financing and was beyond the debtor's immediate control;

7. The plan for development does not require substantial additional financing;

8. The plan for development does not depend upon additional speculative investment on the part of a subsequent developer/owner (the project is an "end use" development).

9. The debtor's failed efforts to reorganize may result in a windfall to the secured creditor.

10. The plan does not significantly extend the time for repayment of the debt beyond the original term.

*In re Clinton Fields*, 168 B.R. at 270–71.


A review of these factors reinforces the Court's view that this case presents a bad faith filing. It is true that the original equity investors made substantial capital contributions in this investment, especially in the form of equity-like loans. These equity interest holders, however, are being eliminated by the Debtor's plan. The postconfirmation

owners of the Debtor are proposed to be a subset of the Debtor's investors.[14] The majority of these mitigating factors are not present in this case. TCB did not sell the property to the Debtor, and is instead the lender. The Debtor's plan is likely to require substantial ongoing financing/equity infusions over the life of the Plan. It is unclear why any party would make these financial contributions unless they were already a guarantor of the Debtor's debt. TCB's note was set to mature by its terms on May 18, 2014. Under the Debtor's plan, the balance of the secured portion of TCB's loan will not be due and payable until the last day of the ninety-six month following the plan's effective date. No meaningful development plans were formulated either before or after filing the bankruptcy case.

### 3.    *The Debtor's Arguments*

In its response to TCB's Motion to Dismiss and the Club's Joinder, the Debtor contends that it filed its Chapter 11 petition in good faith for the following reasons: (1) one of its goals is to maximize the value of its assets for the benefit of unsecured creditors; (2) it harbors no "sinister motives" like the debtors in *Phoenix Piccadilly*; and (3) because of the case's complexity, it should be given time to develop and put forth a plan of reorganization in this case. (Dckt. 143, ¶ 21.)

The Court is not persuaded by these arguments. Under the Debtor's proposed plan, the class of non-insider general unsecured creditors will receive a dividend of only

---

[14] The Debtor's disclosure statement provides that these individuals will include Michael Greene, David Rowe, Arthur Scanlan, and G. Glen Martin. (Dckt. 212, at 25.)

about 7.5 percent.[15]  TCB's deficiency claim of $1,639,331.30 represents over half of the total amount of claims in this class, and TCB has strenuously argued that this case's dismissal is in its best interest.  It is true that the Debtor did not engage in forum shopping like the debtors in *Phoenix Piccadilly*; however, as discussed above, other circumstantial factors showed the Debtor's "petition was filed 'to delay or frustrate the legitimate efforts of secured creditors to enforce their rights.'"  *Phoenix Piccadilly*, 849 B.R. at 1394 (quoting *In re Albany Partners*, 749 F.2d at 674).  Lastly, the Debtor has now had the opportunity to file a plan of reorganization.  After review of the Plan, the Court now has the facts necessary to make the totality of the circumstances determination that this case is a bad faith filing. *See In re Clinton Fields*, 168 B.R. at 269 ("It is the entire context of the circumstances which compel the inference of abuse of the court's jurisdiction." (internal quotation marks omitted)).

B.      Cause Under Section 1112(b)(4)(A)

        Pursuant to § 1112, cause for dismissal of a Chapter 11 case includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).  "The purpose of this ground is to prevent the debtor-in-possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation."  *In re AdBrite Corp.*, 290 B.R. 209, 215 (Bankr.

---

[15] The Plan proposes that total claims for this class will be about $2,658,331.00. This class is proposed to receive $200,000 pro rata within fourteen days of the Plan's effective Date.

S.D.N.Y. 2003) (internal quotation marks omitted). Bankruptcy courts have consistently held that postpetition negative cash flow coupled with an inability to pay current expenses qualifies as a continuing loss to or diminution of the estate. *See In re Tri-Check Seeds, Inc.*, No. 12-11409, 2013 WL 636031, at *3 (Bankr. S.D. Ga. Feb. 3, 2013) (Barrett, J.) (finding a substantial or continuing loss or diminution of the estate and the absence of a reasonable likelihood of rehabilitation where "the testimony and operating reports show[ed] negative cash flow but for the cash infusions from [the debtor's sole shareholder]); *Mission Oaks Nat'l Bank v. Youngwoo Moon (In re Youngwoo Moon)*, No. 12-20731, 2012 WL 6727186, at *2 (Bankr. S.D. Ga. Dec. 13, 2012) (Dalis, J.) (finding a loss or diminution of the estate where the debtor had ongoing negative cash flow and would not have been able to meet current expenses without loans from family members); *In re Motel Props., Inc.*, 314 B.R. 889, 894–95 (Bankr. S.D. Ga. 2004) (Davis, J.) (finding that the debtor was experiencing a continuing loss to or diminution of the estate where it continued to lose money postpetition and failed to make various postpetition tax payments and payments to its secured lender).

TCB argues that there has been a substantial loss or diminution of the estate because, since filing the case, the Debtor has not paid ad valorem taxes, made any payments to the Club or POA, or put aside funds for these expenses in escrow, all while continuing to incur debt to pay administrative expenses to its attorneys and experts. Importantly, interest continues to accrue on certain debts. Since filing its petition, the Debtor has not sold any assets and or collected any of its accounts receivable. The Debtor's manager testified that

he is not actively trying to collect receivables. The fact that debtor-in-possession financing has been approved and is currently covering some of the current expenses of the Debtor's professionals does not alter the Court's finding. *See Mission Oaks*, 2012 WL 6727186, at *2. Consequently, I find that there is a continuing loss and diminution of the Debtor's estate that is very substantial in nature.

Because § 1112(b)(1) is written in the conjunctive, the Court must now determine whether there is an absence of a reasonable likelihood of rehabilitation. *See In re Motel Props.*, 314 B.R. at 895. "Rehabilitation means that the 'debtor will be reestablished on a secured financial basis, which implies establishing a cash flow from which its current obligations can be met.'" *Id.* (quoting *In re AdBrite Corp.*, 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003)). Rehabilitation "contemplates the successful maintenance or reestablishment of the debtor's business operations." *Canpartners Realty*, 419 B.R. at 89 (internal quotation marks omitted).

There is not a reasonable likelihood of the Debtor's rehabilitation. *See* 11 U.S.C. § 1112(b)(4)(A). In essence, the Debtor's Plan provides that the lots that are TCB's collateral will be sold over the next eight years at prices at least equal to a "release price" set by Plan. The Debtor reserves the right to abandon (meaning return), at any time, a piece of collateral in full satisfaction of an apportioned amount of TCB's secured claim. South Carolina Bank and Trust's secured claim is to be satisfied by the Debtor surrendering eight

of the thirteen Resident Memberships that serve as its collateral on the effective date of the Plan. As a surrender value, the Debtor uses the current price of a Resident Membership ($50,000) despite the fact that the Debtor recognizes that proceeds from the sale of these memberships will come at a future date and that a dollar today is worth more than a dollar received many years later. Likewise, the Debtor intends to surrender, on the effective date of the Plan, most of the Club's collateral in full satisfaction of its debt. The Debtor plans to surrender six lots, thirty-three Resident Memberships, and ten Sporting Memberships, but the Debtor also plans to retain eighty-one Sporting Memberships. Five of the Debtor's Resident Memberships, represented in the Plan as unencumbered, would be sold to provide a small recovery to "Allowed Subordinated Insider Claims in Class 7." (*See* dckt. 213, at 5–6 (providing that Class 7 claims total about $6,235,875).)

The Debtor hopes that, after an initial investment of $870,000.00 from the new equity owners, it will be able to sell enough lots and receive enough proceeds from the sale of memberships to cover its obligations and maybe even earn a profit. Even assuming that the Plan could be amended to be confirmable in substantially its current form,[16] the rehabilitation of the Debtor is unlikely for two main reasons. First, regarding the property that the Debtor does not surrender, interest will continue to accrue and POA assessments will

---

[16] At the July 14, 2014 and July 15, 2014 hearings, the Debtor acknowledged that the Plan would need to be amended in several respects, which is not uncommon for Chapter 11 reorganization cases that have been pending for about the same period as the Debtor's case.

◈AO 72A
(Rev. 8/82)

be incurred.[17]  Second, over the last *six* years, the Debtor sold *none* of its lots.  In order to have positive cash flows  over the next *eight* years, the reorganized debtor will need to sell lots at prices sufficiently over the release prices to cover all of its other expenses, which will be significant.  This is unlikely because the release prices would represent the fair market value set for those assets by this Court.  To be sure, the fact that the price of Resident Memberships have recently decreased should increase their marketability; however, this positive factor is more than offset by the fact that the Debtor will be surrendering lots, Resident Memberships, and Sporting Memberships to its secured creditors.  These parties will in turn be offering these assets for sale, further reducing the marketability of the assets that the Debtor retains.  The alleged fact that the new equity owners have the financial wherewithal and incentive to fund the Debtor's postconfirmation cash shortfalls does not compel a different result; what matters is that it is likely that the Debtor will experience long-term postpetition losses. *See In re AdBrite Corp.*, 290 B.R. at 216.

### C.    Conclusion

I find that dismissal, rather than conversion, is in the best interest of creditors and the estate.  The Debtor has not shown and the Court has not found any  "unusual circumstances" within the meaning of § 1112(b)(2) that would justify this Court not dismissing the Debtor's case for cause. Therefore, I will order that this Chapter 11 case be dismissed.

---

[17] It is unclear whether the Debtor would incur Club dues as well.

## V.   MOTION FOR RELIEF FROM STAY

TCB seeks, in the alternative, for relief from the automatic stay with respect to the sixty-six lots and fifty Resident Memberships in which it holds a security interest. TCB argues that it is entitled to stay relief "(i) for 'cause,' including lack of adequate protection and bad faith by the Debtor, (ii) because the Debtor does not have any equity in the Property and an effective reorganization of the Debtor's business affairs is not possible, and (iii) because relief from the stay is inevitable due to the Debtor's inability to meet the single asset real estate case requirements for continuance of the stay." (Dckt. 12, ¶ 11.)

TCB bears the burden to prove that the Debtor has no equity in the property to which it seeks stay relief. 11 U.S.C. § 362(g)(1).  The Debtor bears the burden on all other issues. 11 U.S.C. § 362(g)(2).

### A.   Bad Faith as Cause under Section 362(d)(1)

"An automatic stay may be terminated for 'cause' pursuant to section 362(d)(1) of the Bankruptcy Code if a petition was filed in bad faith." *Phoenix Piccadilly*, 849 F.2d at 1394 (citing *Natural Land Corp. v. Baker Farms, Inc. (In re Natural Land Corp.)*, 825 F.2d 296 (11th Cir. 1987)).  Because the Court finds that the Debtor filed its petition in bad faith sufficient to warrant dismissal, the Court also necessarily finds that the Debtor filed its petition in bad faith sufficient to warrant stay relief. *See Phoenix Piccadilly*, 849 F.2d at 1394 (finding that what amounts to bad faith is the same for both proceedings).

B.      Stay Relief Under Section 362(d)(2)

Bankruptcy courts must grant stay relief "with respect to an act against property" if two conditions are met. 11 U.S.C. § 362(d)(2). First, the debtor must not have equity in the property at issue. 11 U.S.C. § 362(d)(2)(A). Second, the property must not be necessary to an effective reorganization. 11 U.S.C. § 362(d)(2)(B).

The Debtor has accepted TCB's valuation of $3.8 million and concedes that it has no equity in TCB's collateral. Therefore, the burden is on the Debtor to prove that those assets are necessary to an effective reorganization. As the Supreme Court stated in *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*:

> Once the movant under § 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the debtor to establish that the collateral at issue is "necessary to an effective reorganization." What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect. This means . . . that there must be "a reasonable possibility of a successful reorganization within a reasonable time." The cases are numerous in which § 362(d)(2) relief has been provided within less than a year from the filing of the bankruptcy petition. And while the bankruptcy courts demand less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan, even within that period lack of any realistic prospect of effective reorganization will require § 362(d)(2) relief.

484 U.S. 365, 375–76 (1988) (footnotes omitted) (citations omitted).

If the Debtor is to have a successful reorganization, the property serving as TCB's collateral will be essential to it. Nevertheless, the Court finds that there is not "a

reasonable possibility of a successful reorganization within a reasonable time." *Id.* In addition to the problems discussed in Part IV.B above, the Debtor will need an impaired class of non-insiders to vote to accept its plan of reorganization. That is very unlikely to occur because the Debtor's secured creditors will control the vote of the unsecured class due to the size of their deficiency claims.

C.      Stay Relief Under Section 362(d)(3)

        Now that the Court has determined that § 362(d)(3) applies in this case, the Debtor must take one of two alternative actions to remain entitled to the automatic stay with respect to its real estate: the Debtor must either file a plan that has a reasonable possibility of being confirmed within a reasonable time or start making monthly payments. Although the Debtor has filed a plan of reorganization, the Court entertains serious doubts about whether that plan has a reasonable possibility of being confirmed within a reasonable time as required by § 362(d)(3)(A). However, to make that determination now would be premature because the relevant time of inquiry is "30 days after the court determines that the debtor is subject to [the SARE case requirements]." 11 U.S.C. § 362(d)(3).

D.      Conclusion

        TCB is entitled to stay relief under § 362(d)(2) and for cause pursuant to § 362(d)(1). Because this stay relief relates to the majority of the Debtor's assets, this is yet another reason that cause exists for the dismissal of the Debtor's case.

## VI.   REQUEST FOR ADMINISTRATIVE EXPENSE

Because I find in Part IV that this case must be dismissed, I decline to rule on the Motion for Allowance and Payment of Administrative Expense and Motion to Require Debtor to Maintain Property (dckt. 105) filed by the POA on the grounds that the issues presented are now moot.

## VII.   MOTION TO EXTEND EXCLUSIVITY PERIODS

Because I find in Part IV that this case must be dismissed, I decline to rule on the Motion of Debtor to Extend Exclusive Periods Within Which to File a Plan and Obtain Acceptances Thereof (dckt. 183) on the grounds that the issues presented are now moot.

## VIII.   CONCLUSION

The Court will grant TCB's Motion to Dismiss and Motion for Stay Relief in their entirety. In closing, the Court notes that its finding that this case was filed in bad faith does not mean that the Court has made a finding that the Debtor or its investors have acted unscrupulously in a business sense. To the contrary, the Debtor appears to be managed by and comprised of sophisticated and professional businesspeople. Under the facts and circumstances of this case, however, the Bankruptcy Code's protections do not extend to this Debtor. *See Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.)*, 235 F.3d 375, 379 (8th Cir. 2000) ("The purpose of Chapter 11 reorganization 'is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay

its creditors, and produce a return for its stockholders.'" (quoting H.R. Rep. No. 595 (1975),

*reprinted in* 1978 U.S.C.C.A.N. 6179)); *Humble Place*, 936 F.2d at 818; *c.f. 15375 Memorial*

*Corp. v. BEPCO (In re 15375 Memorial Corp)*, 589 F.3d 605, 619 (3d Cir. 2009). The Court

will enter a separate order consistent with these Findings of Fact and Conclusions of Law.


Dated in Savannah, this 22nd day of August, 2014.


Edward J. Coleman, III
United States Bankruptcy Judge
Southern District of Georgia